MORGAN, LEWIS & BOCKIUS LLP
Larry L. Turner (*Admitted Pro Hac Vice*)
larry.turner@morganlewis.com
1701 Market Street
Philadelphia, PA 19103-2921
Tel:  +1.215.963.5000
Fax:  +1.215.963.5001

MORGAN, LEWIS & BOCKIUS LLP
Jason S. Mills, Bar No. 225126
jason.mills@morganlewis.com
Joseph V. Marra III, Bar No. 238181
joseph.marra@morganlewis.com
300 South Grand Avenue
Twenty-Second Floor
Los Angeles, CA  90071-3132
Tel:  +1.213.612.2500
Fax:  +1.213.612.2501

Attorneys for Defendants
THE BOEING COMPANY; BOEING DEFENSE, SPACE & SECURITY; BOEING NETWORK & SPACE SYSTEMS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL BRENT, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>THE BOEING COMPANY, a Delaware corporation; BOEING DEFENSE, SPACE & SECURITY, a division of BOEING, business entity form unknown; BOEING NETWORK & SPACE SYSTEMS, a part of BOEING DEFENSE, SPACE & SECURITY, a business entity, form unknown and DOES 1-10,<br><br>Defendants. | Case No. 2:17-cv-04429-ODW-E<br><br>**DECLARATION OF WILLIAM CHURLEY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Judge:        Hon. Otis D. Wright II<br>Date:          July 15, 2019<br>Time:         1:30 p.m.<br>Ctrm:         5D<br><br>Case Filed:      June 14, 2017<br>Pretrial Conf.:  August 19, 2019<br>Trial Date:      September 24, 2019 |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

# DECLARATION OF WILLIAM CHURLEY

I, William Churley, declare and state as follows:

1.    I am currently employed by The Boeing Company ("Boeing") in the Boeing Testing & Evaluation Department, in the position of Manager (Level K), a position I have held since July 2008. I have been managing engineers since June 2017, and prior to that I managed hourly, union employees. The matters stated herein are of my personal knowledge. If called as a witness, I could and would testify competently to the matters set forth in this declaration. I submit this declaration in support of Defendants' Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment.

2.    I hold a Bachelor's degree in Aerospace Engineering from Penn State University and a Master's degree in Material Science and Engineering from University of California, Irvine. I began my career at Boeing in 1996 as an Engineer. I worked as an engineer for approximately 12 years and became a Manager in 2008. From December 2011 to approximately June 2017, I was a Space Simulation Lab "SSL" Test Technicians Manager. During that time, I was Mr. Brent's manager, as Mr. Brent worked (and still works) in SSL.

3.    Boeing employees may report conduct they find potentially in violation of Boeing's anti-harassment, anti-discrimination, and anti-retaliation policies to: any manager, Human Resources, Boeing's anonymous hotline, Boeing's Global Diversity & Inclusion Department, Boeing's Ethics Department, Boeing's Equal Employment Opportunity Department, or their union representative.

4.    All hourly technicians in SSL, regardless of seniority, experience, and race are assigned certain mandatory maintenance work. For example, both Mr. Brent and Vince Cooney, the Caucasian hourly lead formerly on third shift, were assigned the task of re-taping SSL floors with safety tape. As the workforce in SSL

has shrunk, maintenance assignments have increased for all of the remaining technicians.

5. To be considered for a salaried lead position in SSL, interested candidates must submit an application and participate in an interview process.

6. Salaried leads, which included Patrick Sawyer up until his retirement, have no authority to decide who is appointed as an hourly lead. That is a determination that only managers make. Salaried leads are not managers.

7. At the El Segundo facility, managers have the sole discretion, if justified by business and staffing needs, to designate one or more hourly technicians on a shift as an "hourly lead." The hourly lead designation is not permanent, and Boeing instructs its managers to appoint them sparingly—maintaining to the extent possible a minimum ratio of one hourly lead for every five technicians on a shift. Exceptions to the expected ratio of one hourly lead per five technicians must be justified based on a business need. Once, I persuaded Boeing Human Resources and Employee Relations to allow me to exceed that ratio on first shift in 2017, due to both a salaried lead and an hourly lead having taken a voluntary layoff and subsequently retiring, leaving a gap in coverage among the eight technicians assigned to the two different labs on first shift.

8. In 2014, Mr. Brent reported that Patrick Sawyer had a cartoon in the workplace. Mr. Brent also stated that he found the term "redneck" to be offensive. In response, I had the cartoon removed from the workplace.

9. On October 21, 2015, Messrs. Brent and Sawyer notified me of a disagreement between them. Between October 22 and November 2, 2015, I interviewed several third shift SSL employees to investigate the October 21 exchange in addition to allegations Messrs. Sawyer and Brent had made against one another about their work habits. I took notes from these interviews as I completed each one, and compiled those notes into a document, a true and correct copy of which is attached hereto as **Exhibit 10**.

10. As a result of the October 21, 2015 exchange and my investigation thereof, both Messrs. Brent and Sawyer were provided feedback on treating one another with dignity and respect. Separately, Human Resources and I coached (but did not discipline) Mr. Sawyer on the fact that Mr. Sawyer did not, as a salaried lead, have the authority to send an hourly technician home. Human Resources and I also coached (but did not discipline) Mr. Brent regarding his workplace demeanor and attitude.

11. On August 15, 2016, Mr. Brent emailed me to complain that Sawyer was not assigning Brent to the chamber test work he desired. A true and correct copy of our email correspondence is attached hereto as **Exhibit 11**.

12. The very next day, an incident occurred in SSL to which it was determined that Mr. Brent was a contributing party. No one was disciplined for the incident, but written protocols intended to prevent a recurrence were prepared and distributed.

13. By virtue of my position with the Company, I have access to Boeing's SSL assignment tracking records, including from 2016–current, as those documents are compiled, maintained, and relied on in the ordinary course of business. Based on my review of these materials, Mr. Brent's work spans the entire range of available SSL technician work, from test chamber work in the large thermal vacuum chambers and in the small unit test chambers (both of which were Mr. Brent's preferred and often-requested assignments), as well as his fair share of miscellaneous work that all technicians, including hourly leads, are assigned. I see no substantive discrepancy between the quantity and quality of Mr. Brent's work assignments as compared to other hourly technicians employed on third shift. In fact, the assignment records show that Mr. Brent had an assortment of assignments, including many he specifically requested, comparable to his coworkers on third shift.

14. Attached hereto as **Exhibit 12** is a true and correct copy of the email

1  correspondence between Mr. Brent, Donna Syas-Brandon, and me between
2  February 2, 2017 and March 14, 2017.
3     15.   Though I am a Manager for Boeing, I have no authority to guide
4  corporate conduct.  Nor do I have any authority to determine and/or influence
5  company policy.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 10 th day of June 2019, at ___El Segundo___, California.

*William Churley*
William Churley